# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Jeffrey Pagenkopf, | Civil No. 17-1081 (DWF/SER) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| United Parcel Service, Inc., | |
| Defendant. | |

Heather M. Gilbert, Esq., Gilbert Law PLLC, counsel for Plaintiff.

Jason Hungerford, Esq., Joseph G. Schmitt, Esq., and Sarah B. C. Riskin, Esq., Nilan Johnson Lewis PA, counsel for Defendant.

## INTRODUCTION

In this case, Plaintiff Jeffrey Pagenkopf brings three disability-discrimination claims against his employer, Defendant United Parcel Service, Inc. ("UPS"), alleging that UPS failed to promote him, accommodate him, and engage with him in the interactive process. This matter is before the Court on a motion for summary judgment brought by UPS. (Doc. No. 42.) For the reasons set forth below, the Court denies UPS's motion.

## BACKGROUND

### I. UPS Operations

UPS is a round-the-clock, unionized operation. (Doc. No. 48 ("Hokens Aff.") ¶ 3.) During the day, package drivers are delivering and picking up packages. (*Id.*) In

the evenings and overnight, package handlers work inside UPS's facilities to unload, sort, and load packages. (*Id.*) Over 160 delivery routes originate in the Minneapolis facility. (*Id.* ¶ 4.) Each day, approximately 52,000 packages are delivered from the Minneapolis facility. (*Id.*) Each driver has between 100 and 300 stops every day, but the number of packages, routes, and stops goes up during the period from Thanksgiving through Christmas. (*Id.*; Doc. No. 49 ("Riskin Aff.") ¶¶ 3, Ex. A ("Kaiser Dep.") at 21; 4, Ex. B ("Hokens Dep.") at 201; 5, Ex. C ("Laber Dep.") at 26-27.)

Most union employees start as part-time package handlers. (*Id.*) UPS's Collective Bargaining Agreement ("CBA") with the Teamsters Central Region sets many of the terms and conditions of employment, including transfer and promotion procedures. (Riskin Aff. ¶¶ 6, Ex. D at Art. 3; 7, Ex. E at Art. I.) Jobs are assigned by seniority, and seniority is based on length of employment. (*Id.*) An employee may work several years before building sufficient seniority to move into a driver role. (Hokens Aff. ¶ 5.)

### A. Process for Becoming a Driver

The CBA governs the process for becoming a driver. The process operates on a seniority system, whereby employees sign a physical notice called a "bid sheet" and the bidder with the most seniority is awarded the bid. (Riskin Aff. ¶¶ 6, Ex. D at Art. 3, Secs. 8, 10; 15 ("Kettler Dep.") at 14-16.) The winning bidder must then fill out an application and pass background and motor-vehicle-record checks, a road test, and a DOT physical. (Hokens Dep. at 36-38.)

The next stage for a candidate is UPS's classroom and on-road driver training class, New Service Provider Training ("NSPT"). (Kettler Dep. at 19-20; Riskin Aff. ¶ 8,

2

Ex. F ("Elmberg Dep.") at 13.)  UPS views NSPT as critical to its safety efforts and therefore an essential function of a driver's job.  (Riskin Aff. ¶ 6, Ex. N ("Gordon Dep.") at 93; Doc. No. 47 ("Elmberg Aff.") ¶ 9.)  The classroom instruction portion of NSPT includes lectures, computer-based trainings, and written tests.  (Riskin Aff. ¶ 17, Ex. O; Elmberg Dep. at 22-24.)

Classroom instruction also introduces candidates to UPS's safety rules, including the Five Seeing Habits, which are habits of safe drivers.  (Riskin Aff. ¶ 18, Ex. P ("NSPT Packet").)  UPS based the Five Seeing Habits on the Smith System, an industry-standard training system, but tailored it based on the company's experience and observations.  (Elmberg Aff. ¶¶ 5-6.)  The Five Seeing Habits include audible communication, such as using the horn to alert pedestrians and other drivers.  (NSPT Packet at 7.)

On-road training has three parts:  (1) the instructor demonstrates and narrates while candidates observe; (2) candidates take turns driving, engaging in simultaneous communication with the instructor to explain their driving decisions; and (3) candidate completes the "driver drill," a test where the driver calls out what he or she observes while driving.  (Elmberg Dep. at 25; Elmberg Aff. ¶¶ 8-11; Hokens Dep. at 148.)  Throughout all driving exercises, UPS expects its driver candidates to verbalize what they are doing.  (Elmberg Aff. ¶¶ 8, 19.)  UPS provides the example that if a driver was pulling away from a parked position, the driver would be expected to narrate putting on a seatbelt, turning on the vehicle, releasing the parking brake, looking for approaching traffic, turning on the turn signal, identifying risks to prevent the rear from "swinging out," and actually pulling away from the curb.  (*Id.* ¶ 10.)

The purpose of on-road training is to determine whether a candidate can adhere to the safety rules while in real-world, high-pressure environments. (*Id.* ¶ 18.) Drivers must be able to plan ahead and use unique techniques to account for the larger size and weight of a package car, which is fundamentally different from a passenger vehicle. (*Id.* ¶¶ 14-15.) As one example, drivers must learn to "rock and roll" their bodies to minimize blind spots. (*Id.* ¶ 15.) Because UPS drivers are regularly traveling residential streets, on-road training is critical. The goal is that drivers will be able to make split-second decisions and treat their safety habits as instinct. (*Id.* ¶ 19.)

Once a candidate passes NSPT, he or she begins a 30 working-day probationary period, during which time they drive their assigned routes. (Elmberg Dept. at 32-33; Riskin Aff. ¶ 10, Ex. H ("Johnson Dep.") at 75.) Supervisors accompany the new drivers during the first several days to reinforce safety habits, show the driver the route, and demonstrate efficient package delivery. (Kaiser Dep. 14-16, 25; Johnson Dep. at 74-77.) If the driver successfully completes the 30-day probation period, then he or she permanently takes over the route. Drivers then participate in ongoing training and observation. (Kaiser Dep. at 79; Gordon Dep. at 93; Johnson Dep. at 78.)

B.   **Essential Job Functions of a Driver**

UPS considers its drivers the face of the company. (Elmberg Dep. at 72-74.) Their most important job function is to drive safely. (Kirby Dep. at 33-34; 51-52.) Consequently, the company considers effective communication with customers and the public an essential function of the driver position. (*Id.*; Doc. No. 46 ("Johnson Decl.") ¶¶ 10-11.) The Essential Job Functions list identified "sufficient ability to communicate,

through sight, hearing, and/or otherwise, to perform assigned tasks and maintain proper job safety conditions." (Riskin Aff. ¶ 9, Ex. G ("EJF List").) Also listed on the EJF List is "operation of the Delivery Information Acquisition Device (DIAD) and the DIAD Vehicle Adapter (DVA)." (*Id.*) The DIAD is a handheld device drivers scan packages with to record a delivery. (Elmberg Dep. at 33-34.) The DIAD produces audio cues signaling whether the scan was successful or not. (*Id.* at 62-63; Elmberg Aff. ¶ 23.)

Drivers must also be able to gain access to secured buildings via buzzers or two-way intercoms because they cannot leave packages outside secured building. (Johnson Decl. ¶ 13.) With respect to certain packages, drivers must also obtain a signature from the customer, which requires greeting the customer, explaining that a signature is needed, obtaining the signature, and asking how to spell the customer's last name for typing into the DIAD. (Riskin Aff. ¶ 11, Ex. I; Kaiser Dep. at 74-76; Riskin Aff. ¶ 12, Ex. J ("Kirby Dep.") at 31-33.) The DIAD beeps when a signature is required. (Elmberg Dep. at 62-63.) Some commercial deliveries require signatures also, and all require the driver to type the receiving person's last name in the DIAD. (Johnson Dep. at 41, 44.)

Several other situations commonly arise requiring communication: customers refusing deliveries, customers with returns, answering questions about UPS's shipping practices, and the general public asking UPS drivers for directions. (Kaiser Dep. at 74-75, 93-94; Kirby Dep. at 74; Hokens Dep. at 210-11; Johnson Dep. at 43; Johnson Decl. ¶ 12.) Moreover, UPS represents that communication needs on any given route are unpredictable, in part because UPS does not track which addresses involve

5

intercoms/secured buildings. (Hokens Dep. at 220-22; Johnson Dep. at 52-54, 86-87; Hokens Aff. ¶ 6; Kaiser Dep. at 58-60; Laber Dep. at 33-34.) UPS balances communication with efficiency, however, and discourages drivers from communicating unnecessarily. (Kaiser Dep. at 80-83; Johnson Dep. at 39.) Drivers also announce commercial deliveries when they arrive to encourage customers to come claim their packages more quickly.

UPS expects its drivers to be extremely efficient also. (Johnson Dep. at 39.) The company relies on accurate predictions for how long deliveries will take to meet deadlines imposed by customer needs, Federal Department of Transportation regulations, and the CBA limit on drivers' hours. (Elmberg Dep. at 40; Riskin Aff. ¶ 6, Ex. D at Art. 12.) Based on engineering calculations, UPS has determined that it takes only 12.78 seconds on average to obtain a signature and type it into the DIAD. (Elmberg Aff. ¶ 25.)

A component of the efficiency goal is "scratch," which is a calculation of how long a route should take on any given day. (Kettler Dep. at 93; Johnson Dep. at 81-82; Laber Dep. at 19.) Drivers are subject to discipline and eventually job loss if they do not "meet scratch," *i.e.* complete the route within the allotted time. (Johnson Decl. ¶ 7.)

**II.    Pagenkopf**

Pagenkopf has been a UPS package handler for 14 years. (Doc. No. 69 ("Pagenkopf Decl.") ¶ 12.) Pagenkopf was born profoundly deaf. (*Id.* ¶ 2.) His primary language is American Sign Language. (Doc. No. 54-1 ("Pagenkopf Dep.") at 184-85.) With hearing aids, he can perceive sounds, but cannot identify specific words.

6

(Pagenkopf Dep. at 274.)  Pagenkopf is thirty-three-years old and lives with his partner and two children in Shoreview, Minnesota.  (*Id.* at 8, 56.)

At work, Pagenkopf communicates via writing.  (*Id.* at 20, 44, 100, 143, 185, 189; Pagenkopf Decl. ¶¶ 6-7, 14-15.)  When Pagenkopf needs to communicate for an extended period of time, such as for trainings or meetings with human resources, UPS provides a sign language interpreter for Pagenkopf.  (Pagenkopf Dep. at 91, 110, 143, 189.)

From the time Pagenkopf started at UPS, his goal has been to become a driver.  (*Id.* at 130-31, 141, 366-68.)  He currently maintains a class D driver's license with a snowmobile endorsement, and he drives each day for work and recreation.  (Pagenkopf Decl. ¶¶ 3, 8-11.)  Pagenkopf has no moving or parking violations in over ten years, and he is a very capable driver.  (Pagenkopf Dep. at 65, 67; Hokens Dep. at 130.)

### A. First Driver Bid

In October 2012, Pagenkopf first bid for a driver position.  (Doc. No. 54-1.)  Pagenkopf won the bid for a route covering the local north Minneapolis area along Highway 36.  (*Id.*)  On October 26, 2012, Pagenkopf obtained his DOT physical, and his federal DOT certification qualified him to drive UPS's commercial vehicles intrastate because the State of Minnesota had a hearing-impaired exception.  (Doc. Nos. 54-1, 55, 56.)  At the time, however, UPS required interstate certification for its drivers, and Pagenkopf could not be interstate certified because the federal government did not yet have a hearing-impaired waiver.  (Pagenkopf Dep. at 146; Hokens Dep. at 62-63; Doc. No. 54-2 at 2221-22.)

Because Pagenkopf would not have been assigned to drive outside Minneapolis, he urged UPS to contact the Federal Motor Carrier Safety Administration ("FMCSA"), which disputed UPS's position. UPS refused, however, and ultimately awarded the driver position to the next highest bidder. (Pagenkopf Dep. at 74-76; Hokens Dep. at 55-56, 74-78.) Pagenkopf sought direction from Rory Hokens, UPS Human Resource Manager, and Hokens mistakenly told Pagenkopf that he needed to get a "federal DOT card" to meet the guidelines. (Doc. No. 54-2 at 2.) In reality, no federal law or regulation prevented Pagenkopf from driving for UPS intrastate, but Pagenkopf was unable to comply with UPS's internal policy. In 2013, however, the FMCSA began granting exemptions to hearing-impaired individuals to meet the hearing requirement of the DOT certification. Pagenkopf received it April 2014. (Pagenkopf Dep. at 177, 178; Hokens Dep. at 171.)

### B. Second/Third Driver Bid

Also in April 2014, Pagenkopf bid on two more open driver positions for routes in South Minneapolis. (Doc. No. 54-2 at 2193.) He again won the bid. UPS delayed his road test for over three weeks though. (Hokens Dep. at 111-12.) When Pagenkopf took the first road test, his trainer, Andrew Johnson, accommodated Pagenkopf by writing on a tablet, establishing gestures to use while on the road, and pulling over as needed to tell him what to do for the evaluation. (Doc. No. 54-2.) Pagenkopf failed the first road test by a few points. (*Id.* at 107.)

On June 25, 2014, Pagenkopf bid on and won another driver position. (Doc. No. 54-2 at 1713.) On July 11, 2014, Pagenkopf passed the road test. (*Id.* at 2019.) The

8

trainer was once again Johnson, and he continued accommodating Pagenkopf by writing on a tablet and pulling over (as needed) to tell him what to do for the evaluation. (*Id.*) Immediately after Pagenkopf passed the test, Hokens told him that UPS would schedule Pagenkopf for NSPT. (Hokens Dep. at 144.) Normally, UPS holds NSPT classes at least "a couple [times] per month" if not more, (*id.* at 145), and usually enrolls its employees in the NSPT right away. (Kirby Dep. at 25; Laber Dep. at 17, 21; Kaiser Dep. at 12-14.) However, UPS delayed Pagenkopf's training for nearly six weeks, though, until September 2, 2014. (Hokens Dep. at 146, 149-50.) Hokens claims that UPS was trying to work out the logistics for Pagenkopf's class; Pagenkopf denies they ever informed him of that. (*Id.* at 148, 150-51.)

Pagenkopf requested an interpreter for his classroom portion of the training. (Hokens Dep. at 156-58.) Hokens told Pagenkopf that UPS could not provide an ASL interpreter for his NSPT training though. (Doc. No. 54-2, Ex. 31; Hokens Dep. at 117; Pagenkopf Dep. at 91, 143.) Pagenkopf tried a few more times to get UPS to provide an interpreter for his training, but UPS never agreed. Ultimately, Pagenkopf agreed to forego an interpreter at the training because he was concerned he would not get promoted otherwise. (Pagenkopf Dep. at 99-101.)

On August 28, 2014, UPS's lead trainer, Jeff Elmberg, also raised concerns about not having an interpreter present for NSPT. (Doc. No. 54-2 at 1703.) Hokens then delayed Pagenkopf's training another week. Finally, on September 5, 2014, Hokens delayed the training indefinitely. (*Id.* at 1896-99.)

9

On September 8, 2014, Hokens and Murray Thurston, UPS's Human Resources Employee Services Supervisor, met with Pagenkopf to notify him that the driver position could not be accommodated. (Doc. No. 54-3 at 1, Ex. 40 ("Thurston Dep.") at 12, 36.) Hokens showed Pagenkopf the driver position description and expressed concerns about Pagenkopf's ability to engage in two-way communication through an intercom. (Hokens Dep. at 191-201; Thurston Dep. at 46-47, 53.)

In response, Pagenkopf proposed multiple accommodations, such as playing a pre-recorded message (e.g. "UPS here."), writing with the customer once he/she came to the door, or as a last resort, leaving a UPS note to re-attempt the delivery later if no one came to the door. (Hokens Dep. at 191-92, 202, 204, 211-12; Hokens 30(b)(6) at 43-44.) Pagenkopf also told Hokens that he knew of successful deaf UPS drivers in California. Hokens tabled the discussion, but afterward, he considered the proposed solutions. UPS could not accept Pagenkopf's solution to leave a re-deliver note when he could not communicate through an intercom. (Hokens Dep. 210-11.) UPS also had concerns whether Pagenkopf would be able to complete his route on time if he had to communicate through note writing. (Hokens Aff. ¶ 8; Elmberg Aff. ¶ 25.)

After two weeks, Hokens met with Pagenkopf on September 25, 2014. Hokens informed Pagenkopf that UPS would not award him the bid because no reasonable accommodations would allow him to engage in two-way communication through an intercom. (Doc. No. 54-3; Hokens Dep. at 208-11, 215-16.)

In October 2014, Elizabeth Brown from Minnesota Department of Human Services, Deaf and Hard of Hearing Services Division, followed up with UPS about its

10

decision to not promote Pagenkopf. Counsel for UPS spoke with Brown and stated that UPS would not promote Pagenkopf to be a driver based on four issues:

> (1) interacting with customers, some customers live in secured apartment buildings; (2) communication through a locked door; (3) Jeff is more danger than most people, cannot hear a horn blasting to alert him to stop or reengage; and (4) often there is lots of interaction between the home office and the driver while the driver is on the road.

(Doc. No. 54-3 at 730-31.) In response, Brown told UPS that "iPhones, iPads, laptops, and other technology including Video Relay Interpreting ('VRI') could assist Jeff in most of these situations." (*Id.*) She also suggested that a "pad and pencil is still a function[al] way to help communication take place." (*Id.*) Brown sent UPS three VRI companies to consider, and counsel for UPS stated that he would look into it and meet with Pagenkopf for a face-to-face meeting. (*Id.*) Neither counsel for UPS nor UPS ever followed up with Brown or Pagenkopf. (Hokens 30(b)(6) at 13-15; Pagenkopf Decl. ¶¶ 23-24.) UPS did not look into VRI or reach out to the VRI vendors that Brown provided either. (Hokens 30(b)(6) at 13-15.)

### C. Fourth Driver Bid

On April 1, 2015, Pagenkopf bid for and won two routes. (Doc. No. 54-3.) On May 12, 2015, UPS met with Pagenkopf and his union steward to explore whether there were any new technologies that would accommodate Pagenkopf. (*Id.*; Hokens Dep. at 229-30.) The group discussed Pagenkopf's ability to communicate through intercoms, and Pagenkopf again offered to play a recording on his phone. (Riskin Aff. ¶ 32, Ex. DD; ¶ 33, Ex. EE; ¶ 34, Ex. FF.) The group also discussed whether amplification would allow Pagenkopf to understand a customer's response; Pagenkopf said no. (*Id.*) The

union steward asked whether Hokens or Pagenkopf knew of speech-to-text technology; neither knew of any. (*Id.*)

Pagenkopf raised the possibility of using VRI, but neither Pagenkopf nor Hokens recall that discussion specifically. (Pagenkopf Dep. at 187-88; Hokens 30(b)(6) at 25-26.) Pagenkopf also brought up Video Relay Service ("VRS"), a phone service for a deaf person to call a hearing person, or vice versa, through an interpreter. (Pagenkopf Dep. at 185.) Pagenkopf also suggested removing certain stops from his route and giving them to other drivers. (*Id.* at 105-06.)

Hoken informed Pagenkopf that he would not be promoted to the driver position because there were no new technologies that would allow Pagenkopf to fulfill the position's essential functions. Hokens focused specifically on Pagenkopf's insufficient ability to communicate with customers, but indicated that UPS had other concerns also. (Riskin Aff. ¶ 32, Ex. DD; ¶ 33, Ex. EE; ¶ 34, Ex. FF.)

At the end of the meeting, Pagenkopf asked UPS to consider him for any full-time position. (*Id.*) The union steward told Hokens the Union would be filing a grievance. (*Id.*)

### III. Pagenkopf's Union Grievance

Six days later, the Union filed a grievance seeking a full-time position for Pagenkopf. (Riskin Aff. ¶ 35, Ex. GG.) Pagenkopf and the Union reached a settlement agreement, a term of which included Pagenkopf getting a full-time package handler job. (*Id.*) UPS refers to the job as a "combo job" because it was constructed by combining two back-to-back part-time shifts. (*Id.*) The settlement agreement indicates that it was

12

made pursuant to the CBA and "the Americans with Disabilities Act (or other applicable law)," and that it "offers a reasonable accommodation to [Pagenkopf]." (*Id.*) Pagenkopf signed the settlement agreement. (Pagenkopf Dep. at 349-50.) Pagenkopf still holds the combo job today, and he has not applied for any of the dozens of drive jobs since 2015. (Riskin Aff. ¶ 36, Ex. HH; Pagenkopf Dep. at 351.)

## IV. Procedural History

Pagenkopf originally filed this case in the Hennepin County District Court. On April 6, 2017, UPS removed the case to this Court. (Doc. No. 1.) In his Complaint, Pagenkopf brings three disability-discrimination claims under the Minnesota Human Rights Act ("MHRA"): (1) Failure to Promote; (2) Failure to Accommodate; and (3) Failure to Engage in the Interactive Process. (Doc. No. 1-1 ¶¶ 51-64.) After UPS answered the Complaint, the parties engaged in extensive discovery. UPS now moves for summary judgment seeking judgment in its favor on all counts in the Complaint.

## DISCUSSION

## I. Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

13

'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. Minnesota Human Rights Act

Pursuant to the MHRA, an employer may not "discriminate against a person with respect to hiring, . . . [or] upgrading, . . . of employment" based on disability. Minn. Stat. § 363A.08, subd. 2(3). Courts analyze MHRA claims under the *McDonnell Douglas* burden-shifting analysis. *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 n.4 (8th Cir. 2007).

### A. Disability Discrimination

A person seeking relief under the MHRA must show (1) he is "disabled," (2) "he is qualified to perform the essential functions of his job with or without reasonable accommodation," and (3) he suffered an adverse employment action due to his disability. *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1032 (8th Cir. 2012) (citation omitted). "The burden then shifts to the employer to articulate some legitimate,

nondiscriminatory reason for the employer's actions. If the employer articulates such a reason, the burden returns to the employee to show the employer's justification is a pretext." *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010) (citations omitted).

Here, neither party disputes that Pagenkopf is disabled within the meaning of the MHRA because his deafness materially limits one or more of his major life activities. Minn. Stat. § 363A.03, subd. 12. Pagenkopf therefore satisfies the first prong of his disability-discrimination claim. The Court also concludes that Pagenkopf suffered an adverse employment action due to his disability, thereby satisfying the second prong. Although UPS hired Pagenkopf into a full-time position, the position has a lower long-term pay scale than that of a driver. The central dispute between the parties concerns the second prong.

UPS moves for summary judgment, arguing primarily that Pagenkopf's claims fail because he cannot perform essential job functions, with or without a reasonable accommodation. Pagenkopf counters that summary judgment is not appropriate because there are two material questions of fact: (1) whether communicating via two-way intercoms is an essential function, and (2) if it is an essential function, whether Pagenkopf could perform it with or without a reasonable accommodation.

The question of whether something is an essential job function is a fact determination. It is the employer's burden to show that a particular requirement is an essential function of the job. *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007). Courts consider several categories in determining whether something is an essential job function:

15

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the current work experience of incumbents in similar jobs; (6) whether the reason the position exists is to perform the function; (7) whether there are a limited number of employees available among whom the performance of the function can be distributed; and/or (8) whether the function is highly specialized and the individual in the position was hired for [his] expertise or ability to perform the function.

*Scruggs v. Pulaski Cty., Ark.*, 817 F.3d 1087, 1092 (8th Cir. 2016). An employer's judgment of the essential functions is probative, but not conclusive. *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 786 (8th Cir. 2004). A job function may comprise a small part of an employee's day, but still be essential. *See Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 914 (8th Cir. 2013) (finding DOT certification was essential function where managers had to drive DOT trucks "from time to time").

Here, UPS argues that "customer communications, including but not limited to communication through intercoms [is] an essential function of the job." (Doc. No. 44 at 22.) The EJF List indicates that drivers must have "sufficient ability to communicate, through sight, hearing, and/or otherwise, to perform assigned tasks and maintain proper job safety conditions." (Riskin Aff. ¶ 9, Ex. G ("EJF List").) Also listed on the EJF List is "operation of the Delivery Information Acquisition Device (DIAD) and the DIAD Vehicle Adapter (DVA)." (*Id.*) The DIAD is a handheld device drivers scan packages with to record a delivery. (Elmberg Dep. at 33-34.) The DIAD produces audio cues signaling whether the scan was successful or not. (*Id.* at 62-63; Elmberg Aff. ¶ 23.) There is also evidence in the record that drivers routinely communicate with customers,

16

must communicate to gain entry into secured buildings, and respond to the general public. Even though two-way intercom communication is a small part of some drivers' days, it is clear that a driver's ability to communicate in all ways contemplated by the EJF List is essential. *See Knutson*, 711 F.3d at 914 (finding essential job function for activity done from "time to time").

Based on the foregoing, the Court concludes that UPS has demonstrated that customer communication, including but not limited to communication through intercoms, is an essential function of the job to which Pagenkopf applied.

The Court next considers whether Pagenkopf can perform the communication-based function with or without a reasonable accommodation. Pagenkopf proposed the following accommodations to allow him to communicate two-way with customers via intercom: voice-to-text/text-to-voice apps such as Dragon and iPhone Notes, pre-recordings, VRS to place a call to customers, VRI to interpret directly from the intercom, assistance from building residents to open the door for him, and leaving a UPS note for a future delivery. (Doc. No. 54-3.) None of these proposed accommodations is unreasonable. *See* Minn. Stat. § 363A.08, subd. 6(a) (providing accommodation is unreasonable if it imposes an undue hardship on employer); *see also Johnson v. City of Blaine*, 970 F. Supp. 2d 893, 911 (D. Minn. 2013) ("[A]n accommodation is unreasonable if it requires the employer to eliminate an essential function of the job."). The evidence in the record cuts both ways on whether or not these reasonable accommodations will allow Pagenkopf to perform the essential function of communication over two-way intercoms. That will be a question for the jury.

17

The Court next considers the issue of training. Pagenkopf argues that the Court should not consider UPS's training argument, alleging that it is an affirmative defense that UPS had a duty to timely raise before discovery closed. The Court finds, however, the interrelated issues of safety and training are ubiquitous in the record. Pagenkopf knew that safety was a primary concern for Hokens, and Pagenkopf himself expressed frustration when UPS would not place him in NSPT.

It is also evident that training is an essential job function for a UPS driver. *See Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1263 (10th Cir. 2009) (identifying safety training as essential job function for corrections officers). Driving a UPS truck has the potential for severe damage or injury, which elevates safety- and training-related activities to an essential level.

The next question then is whether Pagenkopf is capable of successfully completing NSPT with a reasonable accommodation. Pagenkopf presented proposed accommodations in the form of interpreters, which UPS has provided for him before, and/or closed captioning for the classroom portion of NSPT. UPS acknowledged that these proposed accommodations are reasonable. (Hokens Dep. at 165.) Pagenkopf also proposed UPS providing an interpreter for the large group portion of the on-road training. Finally, Pagenkopf proposes that during the one-on-one portion of the on-road training, he could pull over to the side of the road to communicate in writing and gesture with the instructor. UPS most strongly opposes Pagenkopf's final proposed accommodation, presenting evidence that NSPT involves continuous communication between the driver-candidate and instructor. The Court finds that viewing all of the evidence in the

18

light most favorable to Pagenkopf, there is a genuine issue of material fact as to whether Pagenkopf can fulfill the training requirements given reasonable accommodations.

### B. Failure to Accommodate

In Count II, Plaintiff alleges a claim for failure to accommodate under the MHRA. The MHRA requires employers to "make reasonable accommodation to the known disability of a qualified disabled person." Minn. Stat. § 363A.08, subd. 6(a). To establish that an employer failed to accommodate a disability, a plaintiff must establish: (1) he is qualified disabled person; (2) the employer knew of his disability; and (3) the employer failed to make reasonable accommodation to the known disability. *See Peebles v. Potter*, 354 F.3d 761, 766-67 (8th Cir. 2004) (explaining that the known disability triggers the duty to reasonably accommodate); *see also, e.g.*, *Jacobson v. Allina Health Sys.*, Civ. No. A08-1356, 2009 WL 1444156, at *5 (Minn. Ct. App. May 26, 2009) (unpublished). An employee is qualified for a position if he can perform the essential functions of the position with or without a reasonable accommodation. *See Scruggs v. Pulaski Cty., Ark.*, 817 F.3d 1087, 1092 (8th Cir. 2016).[1] Under the MHRA, an employer must reasonably accommodate an employee's disability unless the accommodation would cause the employer undue hardship. Minn. Stat. § 363A.08, subd. 6(a).

---

[1] In applying the MHRA, the Court looks to federal caselaw interpreting similar language in federal anti-discrimination statutes. *See, e.g.*, *Lang v. City of Maplewood*, 574 N.W.2d 451, 453 (Minn. App. 1998).

19

As stated above, the Court concludes that there is a genuine issue of material fact concerning whether Pagenkopf can perform the essential functions of the driver position with a reasonable accommodation. Summary judgment is therefore inappropriate.

Here, viewing the evidence in the light most favorable to Pagenkopf, the Court concludes that there are fact issues concerning reasonable accommodations that preclude summary judgment on the disability-discrimination and failure-to-accommodate claims.

## ORDER

Based upon the foregoing, **IT IS HEREBY ORDERED** that Defendant United Parcel Service, Inc.'s Motion for Summary Judgment (Doc. No. [42]) is **DENIED**.

Dated: January 22, 2019         s/Donovan W. Frank
                                DONOVAN W. FRANK
                                United States District Judge